May it please the Court. My name is Thomas Peterson, and I'm appearing on behalf of the appellants this morning. The District Court in this case created what is in effect a federal sanctuary for a state law cause of action that was declared unconstitutional by three different California Court of Appeal decisions, all based entirely on the application of the No, Your Honor, not true. The first case, the ARP Pharmacy case, I'm sorry, the ARP Pharmacy case, the first case, was decided in 2006 before Division IV of the 2nd Appellate District. Then, in February of 2007, the two cases before Division VIII of the 2nd District handed down the Bradley and AAM health cases. And the composition of those panels was a little bit different in Division VIII as well. And in the California Court of Appeal system, there is no requirement that the panels have to follow one another on interpreting questions of the state law. In any event... Wait a second. So there are three different trial court judges who found the law unconstitutional. Two judges, Your Honor, because one of them heard two of the cases. Okay, so two judges, two trial court judges. Correct. And then you had the panel, was it Justice Norm Epstein that wrote... Presiding Justice Epstein wrote the Division IV case. You had three there. And then you had Justice Candace Cooper with one panel that overlapped by two. So how many, we're talking about nine... You have nine judges in total who have expressed their view that this statute is unconstitutional under Article I, Section 2 of the California Constitution. State constitution. Exactly. Only under the state constitution. And their decision is expressly predicated on that. And the second two, all three were the second appellate district, right? Yes, Your Honor, that's correct. And did the second two, the second two were unpublished? They were unpublished. And did they follow the first decision? Did they cite the first decision and follow it? They did, Your Honor. They said that they had considered and decided to follow the ARP Pharmacy case. And then in addition to that, they evaluated some arguments that the plaintiff had made specifically attacking the ARP Pharmacy case, which I don't recall had actually been in the ARP record as well. Okay. In these circumstances... And you have no, none of the other six appellate districts have considered these issues? No. No, Your Honor. That's right. It's been dis... I'm sorry, none of the other five? That would be correct. And as you know, within a second district, you have eight different divisions, each quite independent. How long ago was it that the California court, Supreme Court, denied the petition to review this case? In June of 2007, approximately one month after Judge Phillips issued her two decisions in this case. Those decisions were specifically drawn to the attention of the California Supreme Court, and the court was urged to take the case on the basis that there was a disagreement. And the Supreme Court declined to do so, and no justice voted to grant the petition for review. And... And what way are we supposed to give the Supreme Court's decision not to consider a case? This court, in the State Farm v. Abrejo case, says that when the Supreme Court denies review, that that is a strong reinforcement of the proposition that this court should follow the decisions of an intermediate appellate court on point unless it has convincing evidence that the Supreme Court would do differently. That, this court has said that in subsequent cases as well. And that's part of the, that's part of the, one of the indicia you have as to why it is that there is no convincing evidence before you that the California Supreme Court would decide this case differently. And indeed, I would just sort of anticipate possibly a question about certifying it to the California Supreme Court. There's been no change of circumstances here that would call for that course of action. That's the question I had. I was wondering, between the time that the petition was denied by the California Supreme Court in 2010, has there been anything that has changed that might affect the Supreme Court's inclination to take this, to certify this question from our court? No, Your Honor. I don't believe there's been any development in the law that would cast into question what the California Courts of Appeal have held. In addition, the arguments that were presented here to you are the same arguments that were presented and considered by the California Courts of Appeal, and thus were presented to the California Supreme Court as part of the basis for its consideration. Cases like the Supreme Court's decision in Fair, as well as arguments, in addition to the California Courts of Appeal, considered and rejected amicus briefs filed by the California Attorney General, pointing out that some of these concerns, which the plaintiff expresses here, are not legitimately present under this statute, namely that it somehow would interfere with the ability of the State to engage in traditional regulation. Because we're dealing in this case with a very specific type of a scheme that the Court of Appeal has said in the Bradley case was designed to turn the pharmacy benefit managers essentially into advocates of a position that the pharmacists favor, which is to increase the amounts that they are paid by insurance companies that pay for prescription drugs of those of us who are insured, insureds. And that's an interest which was sponsored in the legislation, which was pressed by the Trade Association of the pharmacists. It tends, as was acknowledged in the legislative history, to increase the cost of prescriptions. And it's contrary to the position that my clients and the insurance companies have that these costs ought to be kept low. And so what the California Court of Appeal emphasized about this, which certainly brings it entirely within the realm of a permissible interpretation of State law, is this is in effect a compelled advocacy type of legislation, which was aimed at requiring my clients to carry a message which was intended to bring about potentially a change in reimbursement rates. And in addition, I think it's also highly significant that the plaintiffs advised the California Court of Appeal, and they advised this Court when it had the understanding appeal before it, that one of the goals of this scheme of requiring these surveys was in hope that this increase of information would have the tendency, if necessary, to be a basis for further lobbying and further price regulation coming out of the California legislature. Because the Court will remember here that this surveying law followed on an unsuccessful attempt to essentially impose reimbursement rates on pharmacies such that the prices to be paid would have gone up. And the legislature rejected that. Is this information available? Or can it be gathered in any other way? Yes, Your Honor. It can. And for example, Business and Professions Code Section 4426 of the California statute required the state to conduct a survey of reimbursement rates. In addition, at the time the legislation was passed, the legislature was told, and this is acknowledged in the ARP pharmacy decision, that the pharmacists themselves, their trade association, had these surveys and they had conducted them. So there isn't any reason that this kind of information, if it were deemed to have been desirable to get out to the public, or rather to the insurance companies that pay for the prescriptions, there isn't any reason that it could have been sent by some medium other than requiring my clients to distribute it and thus turn them into, as Justice Cooper pointed out in her decision in the Bradley case, into what is essentially advocates on behalf of the pharmacist industry with respect to a position tending to increase reimbursement rates for prescriptions, which is contrary to what the service that they claim to be providing to their customers and to the interests of the insurance companies as well. Now, keep in mind also that the California Court of Appeal decision in this case resting on Article I, Section 2 of the California Constitution is thereby rooted in a provision of the state of law which is broader, repeatedly been described by the California courts as broader than the protection of speech which is found in the First Amendment. Now, it is true, as has been pointed out, that the California Court of Appeal decisions, particularly the first one, considered and evaluated a First Amendment precedent in deciding what the rule of California law should be, but for purposes of considering this case from an eerie point of view, it's not at all uncommon, and in fact the California Supreme Court has endorsed the idea, that in interpreting the state constitution, that it's appropriate to consider what the federal constitution provides. But if at the end of the day, as in this case, the California courts have clearly said they are basing their decisions solely on the California Constitution, that doesn't make the resulting decision any less one of California law, just as when this court decides what the law of the Ninth Circuit would be on a particular question, it's very often the case. Perhaps you will head there this morning, based on an argument I heard this morning where nine other federal circuits have apparently announced a rule that you're being asked to consider in this court, but the fact you engage in that analysis doesn't make the decision that this court would hand down any less a decision of this court, and under the eerie principle, as we all know, the decision the California court makes is one that is not open to being second-guessed by a federal court on the basis that there should be some better or different rule. The question is, what do we think the California Supreme Court would do? Correct. That's right, Your Honor, and what I'm trying to get across to you is that you don't have any indicia that the California Supreme Court would look at this question any differently, because you've got the kind of case where this becomes a difficult question, I think, is the kind of case where you have an older decision. Here you have three fairly recent decisions. You have some disagreement that's been expressed among the courts of appeal on a question. You have sometimes cases where this court decides a rule and then a California appellate court comes along and says that it thinks this court didn't get the rule correct as a matter of California law. You don't have this kind of a situation here. You have uniformity of view among these California judges. You have the denial of review. You have the fact that you are supposed to place great weight on those intermediate decisions unless you have convincing evidence otherwise, and you have, as I was trying to explain a moment ago, you have all these indications that this decision is perfectly in line with and consistent with all of the principles and objections that were presented as reasons why it was wrong or shouldn't be followed. The California courts methodically thought about all of those, and as I say, given the sort of advocacy nature of this legislation, it's perfectly appropriate to classify it, as was done in this case, as a speech-type restriction, compelled speech in circumstances where the state constitution, more broadly than the federal constitution, protects the right not to be required to speak on a subject at all. So I think at this juncture, unless you have more questions for me, perhaps I would reserve the balance of my time. All right. Thank you. Good morning, Your Honor. This is Michael Baus on behalf of the appellees. Would you start out by addressing the Erie issue? I will, Your Honor. Thank you. I think what's important to note here, and this actually flows over into some of the other issues. I think they're related very closely. What's important to note here is the Erie issue really, the question is, how wrong does the court of appeal have to have been in the ARP case in order for a different result to be achieved in this case? Fundamentally, that's what it asks. It says, well, if it was just wrong, then we can decide it differently. Or was it wrong enough that the Supreme Court is going to resolve the answer differently? And it seems to me that the answers to those two questions in this case are really the same, because the reasons the court was wrong are reflected in the decisions of the California Supreme Court, which reflect that the Supreme Court would reach a different result. And in the cases relied upon, and the federal laws relied upon by the California Supreme Court, which also reflect that the California Supreme Court would reach a different result if it considered the issue here. Relevant to this, Your Honor's asked the question, what has changed since the Supreme Court denied review here? I think actually there are three things that have changed that suggest either that the court would take review of this case now, or would certainly reach a different result than the Court of Appeal did. The first is that, as I recall, there were three justices who recused themselves from the decision as to whether to take review. One of those was Chief Justice George, who has since retired. So the makeup of the court has changed. I think that may have had some impact on the decision whether or not to take review. Did they give a basis for recusal? Was it ownership of stock? No. I have a suspicion. He typically recused himself from cases in which my firm was involved because his son is a partner of mine. All right. That would make sense. And then the other two? The other two are that the United States Supreme Court's decision in the Millivetz-Gallup and Millivetz versus the United States case has come out recently, which I think addresses some of the issues that I want to talk about in a little bit, namely, how do we go about determining whether something is commercial speech or core speech? And lastly, the Supreme Court's decision in the Rumsfeld versus Fair case, although it was decided before the California Supreme Court denied review here, I think it's important to note that the California Supreme Court has never considered this issue of what is the impact or meaning of that case on free speech analysis. And it seems to me that if presented with that issue, the Court would reach a different result here as well. As I was saying, the reasons that it's clear in my mind, and I think ought to be clear to the Court, that the California Supreme Court would reach a different determination here and why it's reasonable to conclude and correct to conclude that the Court of Appeal was wrong in its decision and analysis here arises out of the free speech, commercial speech, core speech analysis or distinction as described by the California Supreme Court in Caskey versus Nike. The ARP court here did what appellants urged this court to do, which is to focus on the survey, the item that they were supposed to speak about as the thing that determines whether what is at issue is commercial speech or core speech. And that's just wrong. It's not consistent with the California Supreme Court's analysis in Caskey versus Nike. It's not consistent with the United States Supreme Court's analysis in the decisions relied upon in Caskey versus Nike or in Rumsfeld versus Fair or more recently in the Milovec case that I was referring to a moment ago. The analysis in Caskey versus Nike, which came principally from the Supreme Court's decision, the United States Supreme Court's decision in Bolger versus Young's Drugs, said that one has to look at three things to determine whether something is commercial speech. First, who is the speaker? Is it someone engaged in commerce? Second, who is their audience? Is the audience, the audience consists of their potential buyers? And third. I'm sorry. I don't mean to interrupt you, but I'm looking for the discussion of the Milovec case in your red brief. Can you? The case, I'm sorry. Let me give the citation of the case. It's so new that it was decided much more recently. The citation. How's it spelled also? It's Milovec, M-I-L-O-V-E-T-Z, Gallup, G-A-L-L-O-P and Milovec versus United States. It's 130 Supreme Court, 1324. It was decided on March 8th, 2010. Well, you know, it would be nice if you notified us in advance. If you're going to rely on a case, it's not in your brief. I appreciate that, Your Honor. It actually was identified in the letter sent by appellants a few days ago. The case was brought to the Court's attention. I think they read it differently, but. All right. Well, as long as you're both familiar with it. So going back to what the court in Caskey versus Knightley said about how do we judge something as commercial speech or noncommercial speech, as I said, first, it said you have to look at who the speaker is. Second, you have to look at who their audience is. Clearly, both of those elements here reflect that this is commercial speech or at least potentially commercial speech because the speaker is someone engaged in commerce. The audience are their customers. The third element, I think, is really where the rubber hits the road here and where the ARP, first of all, the ARP court did not consider this test at all. It's not Caskey versus Knightley test derived from the Bolger versus Young's drugs case. But. Did the ARP case, remember, opinion indicate, or not indicate, did it state that it was following any state case that went beyond the First Amendment? No. Absolutely not. The decision in the ARP case, while purportedly based on California Constitution, relied entirely on federal constitutional law or on cases like Caskey versus Knightley from the California Supreme Court, which are based entirely on federal interpretation of the First Amendment. There is no issue in this case in the ARP court nor any other court made any that the California Constitution is in any way different from the federal constitution on these issues. And in no way did they rely on any law that reflects that the result achieved here or, excuse me, there would be different from a result achieved in the First Amendment analysis that the Supreme Court, the California Supreme Court adopted in Caskey versus Knightley. So this third, this third question is, this third question is, what is the content of the message at issue? Is it commercial in nature? And fundamentally, it seems to me, here's the problem. The appellants are arguing here, as before the California colored courts, that the message to be looked at is the message that's, that the disclosure that's at issue, the, the, the, here are the survey that's to be released. That's inconsistent with the analysis in Caskey versus Knightley. It's inconsistent with the analysis in the Milovec case that I, that I identified. It's inconsistent with, with all of the other cases that deal with this commercial speech issue. It's even inconsistent with the arguments that they make. The speech that one ought to look at in this context to determine whether this is a commercial speech is the speech that's either to be corrected by the compelled disclosure or the speech that is purportedly burdened by the compelled disclosure. For example, in the Milovec case, that case dealt with a, a federal statute that required debt collectors and, and those engaged in debt relief activities to make certain disclosures, disclosures in the context of their communications. And specifically required them to say, well, this is a debt relief advertisement and, and if you file for bankruptcy, there are certain costs that you can incur. The analysis about whether that was appropriate or inappropriate hinged entirely on its effect on the speech that the speaker was engaged in in the absence of the disclosures, not on the disclosures themselves. In other words, it's the speaker's speech, the burdened speech, so to speak, that determined whether or not the, the disclosures were, were commercial speech or non-commercial speech. In cases where the focus is entirely on the compelled speech or the compelled disclosure, the court in cases like this where, where the, the information to be disclosed is purely factual, contains no expression of viewpoint, the Supreme Court, for example, in Rumsfeld v. Fair, Rumsfeld v. Fair, that it would just be improper to elevate that to First Amendment analysis because there's really nothing significant going on here. That's essentially what happened. Actually, in Rumsfeld v. Fair, didn't the court say that the Solemn Act didn't burden the law schools because it did not require them to say anything? No, I don't think so. I think so. I just looked at it again. It said it did not compel them to say anything at all, just to provide administrative relief. Well, this, this is the language I'm referring to. At, at page 62 of the decision in Rumsfeld v. Fair, the court said, compelling a law school that sends scheduling emails for other recruiters to send one for a military recruiter is simply not the same as forcing a student to pledge allegiance, forcing a Jehovah's Witness to display the motto, live free or die, and trivializes the freedom protected in Barnett, Woolley, and Woolley to suggest that it is. So you're right. The statute itself. So you're equating the speech here with email, scheduling emails? Well, what I'm saying, in a sense, yes, but really no. What I'm saying is that the speech that we ought to be focused on to determine whether or not what's at issue here is commercial speech or non-commercial speech, is the speech that the statute is directed to correct. And, which actually will get me to my third point in just a moment. What is that speech? That speech is the communications between the appellants and their customers, which the California legislature was fearful, suggested that pharmacies were the cause of high drug prices, rather than the prescription benefit managers themselves. This really leads to, I think, the third point that I was going to make. I'm sorry. I'm kind of stuck on your second point. I'm not really following what speech we're supposed to be examining and that the state courts failed to examine in your analysis.  It's not speech that is compelled by this statute. No. You're saying it's beyond it. Yes. This statute was enacted for a purpose. The purpose of this statute was to dispel what I think the legislature feared was the inherent inaccurate information that's provided by PBMs to their customers. The PBMs have an interest in concealing from their customers that the reason that drug costs to insurance companies, insurers, and third-party payers are high is because the PBMs are a significant cost point, rather than the suggestion that is created, which is that pharmacies charge substantial fees for filling prescriptions. That's why this statute requires the disclosure of information about what pharmacies charge to uninsured patients, so that those fill fees, the charges made to fill a prescription can be juxtaposed against what is charged to the insurers through the PBMs. You're saying the PBMs add an extra layer of cost. Substantial. Okay. That's passed on. But I still don't understand why that means that we don't look at the speech that's at issue, that's compelled by these statutes. Because in the Milibus case, as I said. It's too bad I don't have that case in front of me. I'm sorry. Well, it's not the only one. I mean, it's an example of this. Just think of any compelled disclosure case. All right. They're really, in a sense, they're really all the same. The analysis is always what is the speech that the disclosure is seeking to  It's the speech that is to be corrected that is the full disclosure of the analysis about whether it is commercial speech or non-commercial speech. Or it could be no speech at all. It could be, for example, the warnings on the cigarette packages that were added to inform people about the hazards of smoking. You're not correcting some other speech. You're informing people of hazards. That's a compelled disclosure. Well, yes. But the reason that that disclosure is compelled is because the absence of the information in the general commercial relationship leaves a misimpression about the effects of cigarette smoking. So the analysis really is on what is the communication or absence of communication between the seller and the buyer, or in this case the PBMs  In other words, is the information that's exchanged between them in the absence of information about what pharmacies charge to uninsured patients, is that information complete or is it incomplete and therefore misleading? This is the analysis engaged in the cigarette case that Your Honor is talking about. These disclosures are required because in the absence of the disclosures, the communications between cigarette makers and their ultimate customers, consumers, are misleading because consumers need to be informed of this information. It's the same thing. Still, the important issue that determines the analysis of whether it's commercial or noncommercial speech is the relationship between the parties between whom the communication is taking place and what is the purpose of the communication. Is it to affect the commercial relationship between them and make that commercial relationship more fair? So now explain how that works in this context. Because what the statute requires is the compilation of data and preparation of reports about price comparisons. Right. Okay. I'll answer that in just one second. I want to make a point that's relevant to that, which is the third point I was going to make, which is that the record here is clearly not right to make a constitutional in this context. The argument being made by the appellants is this is unconstitutional on an as-applied basis. Well, as-applied in what context? What are the facts as to how it's applied? As Your Honor is asking, what are the communications between the appellants and their customers? None of that exists in the record because this is decided on the pleadings rather than on the basis of the fuller record. And the California Supreme Court's decision in the Garawan case, which is cited in our briefing, Garawan 2, which is cited in our briefing, says that's not okay. You have to have a record on this issue in order to make determinations about whether on an as-applied basis a statute is constitutional or unconstitutional. We have to know what are the communications, how does it burden the communications, what are the relationships between the parties and the people to whom the communications are being directed. We don't know any of those things because there isn't a record here. But to answer your question, I'll tell you what I think the record will reflect on. So you were the counsel in the Bradley case? I was, yes. Did you make this argument to the state courts? Yes. And they didn't address it in their decision. It just wasn't addressed. The answer to Your Honor's question is that the information reflected in the case is that the fees paid to pharmacies by insurers through PBMs, the appellants here, have been on a downward track, a substantial downward track, for many years. This is now 20 years ago and it's continued since then. That the amounts paid in reimbursement are so insubstantial that pharmacies have difficulty surviving. The legislature was concerned that in the absence of disclosures of pricing decisions, parties with whom the pharmacies have no collective voice because of the antitrust statutes and other rules, those parties, namely the insurers, aren't informed ultimately about, well, how good a deal are we getting? Is there more to pull out of the pharmacies or not? And in the absence of that information, which is the information provided by the statute, pharmacies are faced with a choice. They can either accept reimbursements from insurance companies at rates that are below their costs often, or they can refuse them and only fill prescriptions for cash-paying customers and some government-funded, people who are on government-funded insurance. That choice is a Hobson's choice because ultimately what's happened and what is happening is pharmacies are going out of business because the insurers essentially control the market for dispensing pharmaceutical drugs because most people in this country have insurance through private insurance insurers or otherwise. The pharmacies cannot survive without that traffic into their store. So they're forced to either go out of business by not accepting reimbursements or accept reimbursements that are so low that cause them to lose money and go out of business for that reason. Do you think this issue or problem is limited to the pharmaceutical industry? Excuse me? Do you think this issue or problem is limited to the pharmaceutical industry? No, I don't think it is. But I think it's a specific problem in this industry because what has been uncovered, and again, like I said, this is not in the record but would be in a more developed factual record. But what has been uncovered is that the high cost of prescription drugs to insurers, the PBM's customers, is impacted by a number of things, including for example, the PBM's now uncovered and largely discontinued practice of collecting rebates from pharmaceutical manufacturers for driving consumers to a particular manufacturer's drugs instead of others, collecting those rebates and then not passing them on to insurers, essentially a hidden profit to the PBMs, a hidden expense to insurers and essentially inherent misinformation. By providing more information, as the statute is designed to do, to insurers to make determinations about what is a reasonable price to pay to pharmacies and certainly a relevant data point is what do pharmacies charge in a competitive market to uninsured patients? The insurers can make more reasoned decisions. And this ultimately leads to a significant interest for the state of California because it's a public health issue. The availability of prescription drugs through a large network of pharmacies is obviously a significant public health issue. So to sort of wrap this all up, the point is the point is that this issue ultimately is not ripe for determination if this is an as-applied determination as argued by the appellants. Because there has to be a development of a factual record in terms of how we decide if it's a facial challenge. If it's a facial challenge, then all we have, all the court has to determine essentially are there any circumstances under which this would be appropriate? And I've just described it. All right. Thank you. I have one question. If the Supreme Court decided tomorrow that this statute did not violate the state law, what would be the position as to the state law? It wouldn't have any effect, Your Honor. We still should not overturn, but we still should not decide the California Supreme Court would decide it differently. That's correct, Your Honor. And moreover, at the legislature. And what is the reason for that? The reason for that is that the California Constitution is an independent document of greater breadth. But what in California law suggests to you that they would, the California Supreme Court would decide it differently than the United States Supreme Court? Because the California Supreme Court from time to time does that. Here, one of the places where the California Supreme Court has recognized a greater breadth of protection under the California Constitution is in respect of compelled speech and the right not to speak. That is the Garawan 1 case from the California Supreme Court. And moreover, going back to a question, Judge Reinhart, you put to my colleague about how the ARP pharmacy case might have indicated that it was relying on distinctive California law. The discussion starts by pointing out the greater breadth of the state Constitution and then quotes from Garawan 1, which disagreed with the U.S. Supreme Court's Glickman view about the protection for compelled speech, albeit in advertising, pointing out that the state right, because speech results from what a speaker chooses to say and what he chooses not to say, the right in question comprises both a right to speak freely and also a right to refrain from speaking at all. So I think the California Constitution --- There's no doubt it pointed out at the beginning that the California Constitution may be broader. That's right. In the opinion itself, it relied entirely on the Federal Constitution. It relied on cases that speak to Federal constitutional principles for the most part, but the Garawan case isn't one of them, and it quotes from that case at a couple of different points in its position. And in addition, again, the law comes from different sources, but it becomes California law when it is assimilated by the California courts. Now, is your challenge as applied or facial? No, Your Honor. It's an as-applied challenge. And the reason for that is, here, this is an enforcement action. Every one of these lawsuits, including the California cases, has been an enforcement action because the statute gives the plaintiffs the right to prosecute as private prosecutors. So they're trying to extract significant amounts of penalties for failure to perform these studies. So it is an as-applied challenge, and it's true it was resolved on the pleadings, but from the perspective of the Erie question, that's how the California cases were resolved. And here, you don't need any more of a record, because here what you have is a statute which is quite specific about what it requires. This isn't a situation, for example, where the statute is very broad and you need some enforcement to see how it's going to be applied in practice. It's very specific about what it requires my clients to do. And the other thing you have, and this takes us back to a point that Mr. Bowsy was making, you know what the purpose of this statute is. And it's very clear under California law from the Los Angeles Alliance case and also from the First Amendment, the Ward case, that in considering whether a statute is content-neutral or content-specific, you look at the purpose of the law. You discern that from the legislative history. You have the entire legislative history of this statute before you. And I'm afraid it does not support the characterization that you heard of it a few minutes ago. This court, in the prior Beeman case, says that the legislature intended these studies to present data in the hope that at the time in the future, this information would become a basis for reimbursement. The goal was to change the amount being paid. In the ARP Pharmacy case, the court very clearly says there was nothing that had to be corrected. The legislative history does not, in any sense, support the argument that this speech was required to perform some sort of corrective function. That might make it somewhat like the Millivetz case, which we wrote to you about in a 28-J letter to point out that the significance of Millivetz is it's one of these cases which the California courts distinguish from the situation they had of compelled advocacy, one of those cases where there was misleading advertising and hence a requirement that there had to be greater disclosure as part of avoiding misleading advertising, not the kind of a situation we're dealing with in this case. Let me also talk a little bit about nothing has, so Millivetz doesn't change the equation before the California Supreme Court. The Fair case was considered by the California Court of Appeal in the AAM Health case and found to be distinguishable because it is predominantly a conduct case, and insofar as it speaks about speech, it reinforces the idea that there can be some protection for statistical data. And keep in mind here, again, when we look at this statutory scheme, mindful of the purpose shown by the legislative history. As Justice Cooper pointed out in her AAM Health case, if the report were truly devoid of a message or expressive content, it would in no manner serve the purpose of influencing payments made by insurance companies or even of collecting data. That was what the statute was designed to try to accomplish. With respect to the recusals in the California Supreme Court, no justice voted to accept review of the case the last time. Justice Kennard and Justice Chin are still on the Supreme Court, and they were the other two who were recused. When there's a vacancy, if it makes a difference, a pro-temporary justice is called forth from the Court of Appeal to sit. So there's been no change of circumstances here that would suggest this case should go to the California Supreme Court. And I would respectfully suggest to you that with three California Court of Appeal decisions squarely on point, with a denial of review before, and with no basis to see why the California courts or the Supreme Court would take a different view of this case, and no right on this Court to second-guess the wisdom of California law, that would be reversed. Thank you. Thank you. The case to be reviewed will be submitted. The Court was adjourned.
judges: Fletcher B. , Reinhardt, Wardlaw